### Hurst v. Duff, Jr., et al.

(Decided December 2, 1913).

## Appeal from Breathitt Circuit Court.

Fraud—Contract of Sale—Action to Set Aside—Evidence.—In an action to set aside a contract for the sale of minerals on the ground of fraud, evidence examined and held insufficient to connect the grantor with the fraud relied on.

J. J. C. BACH and GRANNIS BACH for appellant.

CHESTER GOURLEY for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

On July 22, 1911, H. C. Duff, Jr., and his wife, Ellen Duff, executed and delivered to R. A. Hurst a deed conveying to him certain mineral rights in a tract of land situated on a tributary of the North Fork of the Kentucky River, in Breathitt County, Kentucky. As a consideration for the conveyance, Hurst executed to Duff two notes, one for $650, payable 90 days from date, and one for $3,000, payable 90 days from date, each bearing interest at the rate of six per cent annually, and secured by a lien on the property conveyed. The $650 note was discounted by Judge D. B. Redwine. The discount charge was $35. The $3,000 note was discounted by Chester Duff. The discount charge was $25.

On August 3, 1911, plaintiff, R. A. Hurst, brought an action against H. C. Duff, Jr., to cancel the contract of sale and the notes executed in pursuance thereto on the ground of fraud. Pending this action the note for $3,000 matured, and E. C. Duff and Chester Duff, claiming to be the owners thereof, brought suit to enforce its collection. The two actions were consolidated and on final hearing plaintiff's petition was dismissed and judgment rendered against him on the note in question. From that judgment he appeals.

Hurst charges a scheme on the part of H. C. Duff, Jr., and E. C. Holliday to defraud him. The alleged scheme was this: Holliday was to and did represent to Hurst that he, Holliday, was the agent of C. B. Slemp for purchasing coal and mineral lands in Perry and other counties on the Kentucky River; that Slemp was very desirous of purchasing Duff's coal, and would pay $8,000 for it, and that if Hurst would buy it from Duff, he, Holliday, would have Slemp take it off his hands at that price.

On the question of fraud the evidence, in brief, is as follows: Hurst says that about the 1st of July, 1911, Holliday came to his office in Jackson and asked him to purchase of Duff a tract of land that Duff owned on the North Fork of the Kentucky River. Holliday said that he was the agent of Slemp, and that Slemp owned about 800 acres of mineral land on Caney Creek in Breathitt County, and that he and Slemp wanted to buy the Duff land in order to bring the mineral through Duff's land, which would afford a shorter route from the 800 acres to the railroad which was being built. By going through Duff's land they would be able to save the building of a railroad down Caney Creek some three

or four miles, which would cost probably $75,000. Holliday represented that neither he nor C. B. Slemp could buy Duff's mineral, and he therefore wanted Hurst to buy it. Holliday showed Hurst a telegram from C. B. Slemp directing him to pay H. C. Duff a bonus of $5,000. Hurst asked Holliday what he must pay for the mineral, and Holliday said pay as much as $8,000, but to get it as cheap as he could, though he believed Slemp would be willing to give as much as $15,000 for it. Certain letters written by Holliday tend to confirm Hurst's testimony. The keeper of the Thompson Hotel, in Jackson, testified that Duff and Holliday were registered at his hotel on July 14, 1911, and in his opinion both names were in Holliday's handwriting. He also testified that some time after the transaction in question he saw Holliday with some money which Holliday said amounted to four or five hundred dollars. J. H. Letton, cashier of the First National Bank, testified that some time during the summer of 1911 Holliday asked him if he would discount a note for $500 if signed by R. A. Hurst. This occurred a day or two before Hurst served notice on him not to discount any of his paper.

Duff testified that some time between the first and third of July he came by Hurst's office. Mr. Hurst, E. C. Holliday and Bob Holliday were present. E. C. Holliday asked him if he had sold his minerals. He told Holliday that he had not, but that he had two letters from Virginia offering $12.50 an acre for it. He then told Holliday he would like to sell it to him and Slemp, the man he was working for. Holliday replied that Slemp did not want minerals below the Perry County line; that the boom was on from the Perry County line up. He further said "I would not give you $500 for the minerals." He told Holliday that he could not get it then. In five or six days from that time he came by Hurst's office. Hurst wanted to know if he would trade his minerals for town property. After some further discussion he left. About the 12th or 15th of July he came by Hurst's office. Hurst told him that he had taken a notion to purchase his minerals. He then priced the minerals to Hurst at $3,500. They got into some discussion about the time of payment and then he left. Nothing further was said about the matter until July 22nd. He then priced the property at $3,750. Hurst declined to give it. Finally Hurst agreed to give him $3,650, and to execute his note payable in 90 days at six per cent

interest. That was Saturday evening. Hurst said he would arrange the papers about Monday. Witness then went home. While at supper Hurst knocked on the door. Hurst said "I have got those papers fixed." Witness went out and asked the clerk to come around and take the acknowledgment. Hurst delivered the notes and took the deed. Never at any time told Hurst that Slemp would take the property. Never at any time mentioned the transaction to E. C. Holliday. Did not know he was in town on July 22nd until after the deed was made. Had never discussed the matter with Holliday. Never entered into any scheme with him by which he was to represent that Slemp would pay $8,000 or any other sum for the property. Never had any talk with Holliday in regard to Hurst buying the minerals. He discounted the notes because he wanted the money to use in a trade. No one got any of the proceeds except himself. He never promised Holliday any part of the proceeds, and never paid Holliday any part of the proceeds or any money whatsoever.

According to E. C. Holliday's testimony, Hurst asked him if he was working for Slemp, and he informed him that he was not. Hurst began discussing the purchase of the minerals. After some talk he and Hurst agreed to purchase Duff's minerals and divide the profits. Hurst suggested that they meet Duff and that he tell Duff that Slemp would not take the minerals. Following this plan he did tell Duff this. As to what took place at the conversation between him and Hurst and Duff, he corroborates Duff. He also stated that he did not enter into any scheme with Duff to sell his property, nor did he receive a part of the proceeds or any sum at any time from Duff. Bob Holliday, his brother, gives the conversation that took place at the time of the conference in substantially the same language as E. C. Holliday.

On the facts as developed by the record, we see no reason to disturb the finding of the chancellor. While there is evidence tending to show that E. C. Holliday represented to Hurst that Slemp would take the lands and pay a bonus therefor, the evidence utterly fails to show that these representations were part of a conspiracy entered into between him and Duff. In other words, even if it be conceded that there was fraud on the part of Holliday, there is nothing to connect Duff with the fraud. The weight of the evidence is to the

effect that Duff had nothing to do with any representations made by Holliday, and that Holliday was never paid any of the proceeds of the transaction or any other sum at that time. In view of the fact that the majority of mankind deal honestly with each other, fraud is never presumed, but must be affirmatively proved. Fraud cannot be sustained by mere suspicion, strained inference or conjecture. Evidence which produces a vague misgiving is not enough. The rule is that in every case there must be such legal evidence as is sufficient to overcome in the mind the legal presumption of innocence, and beget a belief of the truth of the allegation of fraud. The S. Rose Co. v. Hasenzahl, 141 Ky., 676. Taking into consideration the legal presumption of innocence and the positive testimony tending to support this presumption, it is manifest that the facts relied on by Hurst tend merely to excite suspicion and are not sufficient to show fraud.

Judgment affirmed.